FILED
Clerk
District Court

AUG 19 2014

for the Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> Plaintiff, <br><br> v. <br><br> **FLOYD MAFNAS MENDIOLA**, <br><br> Defendant. | Case No. 1:14-CR-00013 <br><br> **DECISION AND ORDER DENYING MOTION TO DISMISS OR TO SUPPRESS STATEMENTS** |

## I.    INTRODUCTION

Defendant Floyd Mafnas Mendiola is charged by indictment with one count of conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. He has moved to dismiss the indictment or, in the alternative, to suppress statements he made to law enforcement agents (Motion to Dismiss Indictment or Suppress Evidence ("Motion"), ECF No. 15). In support of the Motion, Mendiola submitted a sworn declaration (Declaration of Floyd M. Mendiola ("Decl."), ECF No. 15-1). The Government filed a Response (ECF No. 26) in opposition to the motion, and Mendiola replied ("Reply," ECF No. 28). After an evidentiary hearing on July 10, 2014, the matter was taken under advisement. Having considered the testimony of three Government witnesses and two defense witnesses (including Mendiola himself), three Government exhibits, and the oral and written arguments of both counsel, the Court finds no grounds to support dismissal of the indictment or suppression of Mendiola's statements.

## II.    BACKGROUND

As to most of the material facts, the prosecution and defense witnesses were in essential

agreement. Except where otherwise noted, the following account of events constitutes the Court's finding of facts.

A. <u>Initial Meeting in Late January 2014</u>

Mendiola is a police officer employed by the Commonwealth Ports Authority ("CPA") and posted at the Port of Saipan. (Tr. 128–29;[1] Decl. ¶ 2.) On January 24, 2014, he was contacted at work by police officer Jesse Stole of the Commonwealth Department of Public Safety ("DPS"). Officer Stole is a member of a joint task force under the direction of the federal Drug Enforcement Administration ("DEA"). Stole told Mendiola that DEA Special Agent Jacqueline Gordon wanted to meet with him. After getting permission from his boss to leave work, Mendiola called Stole back and agreed to the meeting. (Tr. 133–34.) Sometime that afternoon, he met Stole at the Bank of Hawaii building, not far from the port. (Tr. 91.) Stole drove Mendiola next door, to the building where the FBI office is located. (*Id.*) They were met at the back door by FBI Special Agent Joe McDoulett, who led Mendiola up the stairs to a second-floor conference room. (Tr. 20.) Mendiola was not handcuffed, patted down, or made to go through a security screening. (Tr. 20.)

Present at the meeting were Mendiola, Stole, McDoulett, and Gordon. (Tr. 21.) The three officers were in street clothes. (*Id.*) They were armed, but their weapons were concealed. (*Id.*)

The conference room had a window, and the door remained open during the meeting. (Tr. 21, 92, 100.) On the conference table lay the CPA code of conduct, a binder with Mendiola's photograph on top, and some DVDs with phone numbers, some of which Mendiola recognized. (Tr. 20, 139.) There was also a whiteboard with two citations to criminal statutes written on it. (Tr. 20.)

---

[1] As the parties did not request a formal transcript from the Court reporter, references are to a rough, Realtime draft transcript that the reporter provided to the Court. Where the transcript is quoted, its accuracy was checked against the audio recording of the hearing, and corrections are shown in brackets.

The agents told Mendiola that they knew he sold methamphetamine. (*Id.*) At first Mendiola denied it, but then they explained that even just arranging a drug sale meant selling drugs. (*Id.*) They told Mendiola they wanted him to cooperate by giving them information on who is using and selling methamphetamine. (Tr. 136.) At this point, Mendiola asked if he was going to be arrested, and Gordon told him they could have him arrested. (*Id.*) McDoulett informed Mendiola that he was not under arrest. (Tr. 22.) Mendiola asked if he should have a lawyer, and McDoulett told him that having a lawyer present would make things more difficult. (Tr. 137.) Mendiola then turned to Stole and had a brief conversation with him in Chamorro. (Tr. 24.) Stole told Mendiola that he could have a lawyer, but it would change things. (Tr. 94.) Mendiola claims that during their talk, Stole told him he would "get off clean" if he cooperated. (Tr. 137.) After talking with Stole, Mendiola told McDoulett that he was ready to continue. (Tr. 24–25.) McDoulett then asked him questions about his methamphetamine use and his suppliers. (Tr. 25.) Mendiola identified three different suppliers of methamphetamine. (Tr. 25.) He also provided telephone numbers he used to communicate with his suppliers. (Tr. 30.)

During the meeting, Mendiola did not feel free to leave. (Tr. 138) He believed that if he refused to cooperate he would be arrested. (Tr. 139.)

Sometime after the meeting, Mendiola called Stole. (Tr. 138.) Mendiola testified that Stole again told him that if he cooperated, he would "get off clean." Stole also told him to "stay low," which Mendiola understood to mean he should not talk to anyone. (Tr. 138.)

McDoulett told Mendiola that the agents believed he had information which could be useful in their investigation of methamphetamine trafficking. (Tr. 21, 26.) He said that if Mendiola cooperated, his assistance would be made known to the United States Attorney's Office. (Tr. 26.) He told Mendiola he could not promise anything with respect to what charges would be brought

1    or how much time Mendiola would have to serve. (*Id.*) He told Mendiola he had to think about his

2    family and his job. (Tr. 27.) Gordon likewise told him to think about what he had to lose, including

3    his job. (Tr. 117.)

4          Stole testified that he heard McDoulett say to Mendiola that his cooperation would be

5    forwarded to the United States Attorney to determine his charges and sentencing. (Tr. 97.) Gordon

6    similarly testified that Mendiola was told only that his cooperation would be brought to the

7    attention of the United States Attorney. (Tr. 110.) Both Stole and Gordon testified that they never

8    told Mendiola he would "get off clean" and never heard anyone tell him that. (Tr. 100, 103, 116.)

9          During the interview, Mendiola was allowed access to this cell phone. (Tr. 31.) After he

10   took a call from work, the agents asked if he needed to go, and Mendiola told them he wanted to

11   continue the interview. (Tr. 33.) After another call from work, the agents offered to schedule

12   another meeting and they let Mendiola leave. (Tr. 33.) McDoulett walked Mendiola downstairs

13   and out of the building. (Tr. 33–34.)

14         B.  <u>January 28 Meeting</u>

15         A few days later, on January 27, Mendiola called Special Agent Gordon to pass along

16   information. (Tr. 110–11.) Gordon asked if he would be willing to meet, and they arranged to meet

17   at the FBI office the next day. (Tr. 111.) At the meeting in the FBI conference room on January

18   28, Mendiola provided Gordon and FBI Special Agent Haejun Park with information about people

19   he believed were selling drugs. (*Id.*) The meeting lasted under a half-hour. (Tr. 112.)

20         C.  <u>February 12 Meeting</u>

21         On February 12, Mendiola met for just under an hour in the FBI office conference room

22   with McDoulett, Gordon, and Ray Renguul, another local police officer on the drug task force.

23   (Tr. 36, 47.) The purpose of the meeting was to establish Mendiola officially as an FBI informant.

24

1   (Tr. 35.) McDoulett had Mendiola sign a form giving permission to use recording devices. (Tr. 36;

2   Ex. 1.) He then reviewed with Mendiola a set of "admonishments" for FBI confidential informants

3   (Tr. 39; Ex. 2.) The admonishments included that any information the informant provides is

4   voluntary; that the informant must provide truthful information; and that the FBI cannot promise

5   immunity from prosecution. (Tr. 40–41; Ex. 2.) Mendiola did not sign the admonishment form or

6   initial the individual admonishments. (*See* Ex. 2.) A third form, which Mendiola did sign,

7   concerned authorization to engage in otherwise illegal activities. (Tr. 42–43; Ex. 3.)

8       After going over the documents, the agents had Mendiola place a recorded phone call to a

9   supplier, but it did not lead to a buy. (Tr. 44.) This was the only time Mendiola made a call at an

10  agent's direction, and he never participated in any controlled buy. (Tr. 45.)

11      D.  March 18 Meeting

12      On March 18, Mendiola called McDoulett and requested a one-to-one meeting to pass

13  along information. (Tr. 47.) McDoulett drove to the port and Mendiola got into McDoulett's car

14  in the parking lot. (Tr. 48.) Mendiola expressed concern that someone had told people at work that

15  he was cooperating with the FBI. (*Id.*) McDoulett assured Mendiola that he would not be forced

16  to participate in any controlled buys where the identity of the target made him feel uncomfortable.

17  (*Id.*)

18      E.  April Meeting

19      Sometime after March 18, Special Agent Park told McDoulett that Mendiola had taken a

20  drug test at his workplace and it had come out positive; and that when confronted with the result

21  Mendiola disclosed he was working with the FBI. (Tr. 49–51.) McDoulett advised his supervisor

22  that he would have to "close" the informant. (Tr. 51.) After taking the necessary administrative

23  steps to effectuate the closure, McDoulett called Mendiola and asked him to come to the FBI office

24

"to listen to some recordings." (*Id.*)

The meeting took place on April 2. (Tr. 51.) McDoulett played audio and video recordings of telephone calls and drug transactions that took place on February 27–28 and March 2, 2013. (*Id.*) Mendiola readily identified one of the two voices on the February 27 recording, but not the other. (Tr. 52.) McDoulett told Mendiola he was lying about having difficulty identifying the other voice. (*Id.*) In a raised and stern tone, McDoulett asked whom he was trying to protect, and Mendiola said he was trying to protect himself. (*Id.*) Eventually, Mendiola acknowledged that the other voice was his own. (*Id.*) He also identified a vehicle in the March 2 video as his. (Tr. 53.)

After Mendiola had made these admissions, McDoulett confronted him with the workplace drug test results. (Tr. 53.) Mendiola maintained that the result was not positive but only reported that the sample was diluted, that he had an innocent explanation for how it got diluted and he had not used drugs. (Tr. 53–54.) When McDoulett announced that the cooperation agreement was over, Mendiola became visibly upset. (Tr. 54.) Mendiola was not arrested and was allowed to leave. (*Id.*)

## III.   DISCUSSION

### A.   Motion to Dismiss

Mendiola asserts that he had an agreement with federal agents that if he cooperated in their investigation of methamphetamine trafficking, he would "get off clean," meaning that he would not be prosecuted for the alleged criminal acts with which he is now charged. (Motion 2.) He maintains that he kept his side of the bargain, but the Government breached their mutual agreement by indicting him. (*Id.*) The remedy for this breach, Mendiola insists, is dismissal of the indictment. (*Id.*) The Government responds that its agents never told Mendiola he would "get off clean" or otherwise conveyed to him that he would not be prosecuted for his role in the February and March

2013 drug sales. (Response 2.) According to the Government, if there was a breach, it was by Mendiola when he disclosed his cooperation to others. (*Id.*)

A cooperation agreement, like a plea agreement, is contractual in nature and "may be analyzed in terms of contract law standards." *United States v. Carrillo*, 709 F.2d 35, 36 (9th Cir. 1983). An agreement may be manifested by the parties' verbal expression of mutual assent, but may also be implied from conduct. *United States v. McHan,* 101 F.3d 1027, 1034 (4th Cir. 1996). To prevail on a claim of transactional immunity, a defendant "must demonstrate at least a meeting of the minds that the government would refrain from further prosecuting him in exchange for his cooperation." *Id.* If the informant performs as agreed, "under settled notions of fundamental fairness the government [is] bound to uphold its end of the bargain." *Carrillo,* 709 F.2d at 37. The "nature and scope of an agreement between the government and [the defendant]" are a factual determination that the court makes. *Id.* The burden is on the movant to persuade the factfinder that an agreement existed. *United States v. Helmandollar,* 852 F.2d 498, 502 (9th Cir. 2002).

Here, it is clear from the record that in exchange for Mendiola's cooperation, federal agents agreed only to put in a good word for him with United States Attorney's Office, and did not promise he would not be prosecuted for alleged criminal acts that occurred prior to his cooperation. There is no evidence that FBI Special Agent McDoulett or DEA Special Agent Gordon made such a promise. Mendiola testified that at the January 24 meeting, McDoulett told him the judge would determine what leniency he would get for having cooperated and provided information. (Tr. 139.) In response to leading questions from defense counsel, Mendiola refined his answer to say that he understood the judge would get involved only if he were arrested and charged after failing to cooperate. (Tr. 140.) As to Gordon, Mendiola testified that she told him he needed to cooperate if he wanted them to help him keep his job. (Tr. 141.) Once again in response to leading questions

from his attorney, Mendiola understood this to mean he would not be prosecuted if he cooperated, because an arrest would cost him his job. (*Id.*) The Court finds Mendiola's initial testimony about what Gordon and McDoulett told him more credible than his passive assent to the artful versions suggested to him by counsel. In any event, the Government cannot be held accountable for what Mendiola hoped the agents were telling him in a sort of coded language. Leniency and help do not amount to immunity from prosecution.

The strongest evidence in Mendiola's favor is his testimony that Officer Stole told him in English, both at the January 24 meeting and in a later conversation, that if he cooperated he would "get off clean." Stole denies he ever said this. In his reply brief, defense counsel observed that the hearing was shaping up to be a swearing contest between Government and defense witnesses. (Reply 1.) This faceoff between Mendiola and Stole is the closest the hearing came to living up to that prediction. Gordon and McDoulett testified they never heard Stole say such a thing. But Stole and Mendiola were speaking mainly in Chamorro. It seems likely that Gordon and McDoulett were not paying much attention to what the other two were saying to one another and might have missed hearing a stray phrase spoken in English. And of course they were not privy to any subsequent conversations between Mendiola and Stole.

The problem for Mendiola is that even if he is telling the truth on this point, it does not establish that the Government promised not to prosecute him in exchange for his cooperation. It was apparent that the federal agents, McDoulett and Gordon, were running this investigation, and that Stole – a Commonwealth police officer on assignment to a joint task force – was merely the go-between. It was not reasonable for Mendiola to accept Stole's take on what the federal agents were offering him without hearing it from the agents themselves. After speaking semi-privately with Stole at the meeting, Mendiola could have asked McDoulett and Gordon if they were really

saying he would "get off clean" and not be prosecuted, but he didn't. During the hearing, when asked if he ever directly asked the agents "What's in it for me?," Mendiola said he did, but he couldn't remember even basic details:

> I don't recall when and the date of the meeting, but I kind of raised that concern up. . . . I'm not really sure what – I don't really recall what did they say, but for me since the beginning when I was told, I was told about the get off clean, I put it all in me, in my mind, if I cooperate I won't get arrested and I'm going to get off clean. (Tr. 145–46.)

This testimony paints a convincing picture of a person hearing what he wants to hear and believing it to mean what he wants it to mean. It may have been reasonable for Mendiola to *hope* he would not be prosecuted if he cooperated – Special Agent Gordon conceded as much on cross-examination (Tr. 121) – but it was not reasonable for him to construe the Government's statements as a promise of immunity in exchange for information.

Moreover, at the February 12 meeting to formally establish Mendiola as a confidential source, McDoulett specifically admonished Mendiola that the FBI cannot promise to protect him from prosecution. (Tr. 42; Ex. 2, p. 3 ¶ 1.) Mendiola testified that he remembered McDoulett so admonishing him. (Tr. 159.) On cross-examination, the prosecutor asked him why he didn't protest that this was different from what the agents had promised him earlier. (Tr. 161) Mendiola responded that he just didn't think back to what was said at the first meeting. (*Id*.) And yet it doesn't matter whether Mendiola thought back to the first meeting or not: on February 12, he heard and understood that the agents were not promising immunity, and he accepted that term by agreeing to cooperate at that time.

The Court finds that a promise of immunity from prosecution was never part of the bargain between Mendiola and federal agents. For that reason, Mendiola's attempt to enforce such a promise and have the indictment dismissed must fail.

It is unnecessary, therefore, to address the Government's alternative argument that it was discharged from performing on its promise when Mendiola breached a material term by disclosing his cooperation to his boss when confronted with his drug test result.

Defense counsel observed that the Government, in its opposition brief, did not argue that the FBI and DEA lacked actual authority to promise immunity from prosecution. (Reply 3.) This was indeed an odd omission on the Government's part, especially considering that McDoulett specifically admonished Mendiola that he lacked such authority. As a rule, a promise made by a federal agent does not bind the United States Attorney, although in exceptional circumstances it may be fundamentally unfair not to enforce the agreement against the Government. *See United States v. Williams,* 780 F.2d 802, 803 (9th Cir. 1986) (per curiam). Because the federal agents did not promise Mendiola immunity, there is no need to inquire into whether this case is exceptional.

B.  <u>Motion to Suppress</u>

Mendiola asserts that his statements to federal agents should be excluded because (1) they were obtained during custodial interrogation without his having been advised of his right to remain silent and his right to counsel, as required by *Miranda v. Arizona,* 384 U.S. 436 (1966); and (2) the statements were involuntary, the product of undue coercion, in violation of his due-process rights. Each of these arguments will be addressed in turn.

1.  *Miranda*

The Government concedes that Mendiola was never Mirandized before questioning by federal agents, but maintains that he was never in custody during interviews and therefore did not have to be read his rights.

To determine whether a person was in custody, "a court must, after examining all of the circumstances surrounding the interrogation, decide whether there [was] a formal arrest or restraint

on freedom of movement of the degree associated with a formal arrest." *United States v. Bassignani,* 575 F.3d 879, 883 (9th Cir. 2009) (quoting *United States v. Kim,* 292 F.3d 969, 973 (9th Cir. 2002)). The court must ask whether a "reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave." *Id.* (quoting *United States v. Booth,* 669 F.2d 1231, 1235 (9th Cir. 1981)). The test is whether, "taking into account the totality of the circumstances, . . . a reasonable person in [the defendant's] position would have felt deprived of his freedom of action in any significant way, such that he would not have felt free to terminate the interrogation." *United States v. Craighead,* 539 F.3d 1073, 1082 (9th Cir. 2008). Factors relevant to the custody determination include: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *Id.* (quoting *Kim,* 292 F.3d at 974). This list of factors, sometimes referred to as the *Kim* factors, is not exhaustive; other factors may be relevant and even dispositive. *Id.* at 884.

Mendiola was interviewed five times: (1) on January 24, the initial interview at the FBI office, by McDoulett and Gordon, with Stole present; (2) on January 28, at the FBI office, by Gordon and Park; (3) on February 12, at the FBI office, by McDoulett and Gordon, with Renguul present; (4) on March 18, with McDoulett, in McDoulett's vehicle parked outside Mendiola's workplace; and (5) the final interview on April 2, with McDoulett and Gordon at the FBI office. At no time during any of these interviews was Mendiola patted down, handcuffed, or otherwise physically restrained. The agents were not in uniform; any weapons they may have been carrying were concealed. Mendiola arrived at the meeting place on his own and left on his own. He was never taken into formal custody. Except for March 18, all the interviews took place in a nondescript

conference room in an office building, not a close and confining interrogation room.

The January 28 and March 18 interviews clearly were not custodial. They were instigated not by the agents but by Mendiola, who wished to provide information. The January 28 meeting lasted no more than 30 minutes. (Tr. 112.) There was no testimony about the duration of the March 18 meeting; but seeing as it was hastily arranged to take place on Mendiola's turf, at the Port of Saipan, and Mendiola was in uniform, presumably on a work break (Tr. 47–47), the meeting could not have lasted very long. These two interviews bear no indicia of custody.

The February 12 meeting likewise was not custodial. Mendiola appeared voluntarily, and the meeting lasted no more than an hour. (Tr. 44.) Its purpose was to close the deal – to officially enroll Mendiola as an FBI informant – not to confront him with evidence of his guilt and obtain incriminating statements. Indeed, it appears that on February 12 not only was Mendiola not in custody, but he was not interrogated. Under *Miranda*, interrogation encompasses both express questioning and "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301 (1980). The only responses that a review of the ground rules of cooperation was likely to elicit from Mendiola were "yes" or "no" as to whether he understood what the agents were telling him. Similarly, asking him to place a call to a supplier in February 2014 was not likely to elicit admissions of guilt as to conduct that allegedly took place a year earlier. If any statements were made on February 12, 2014, they were not the product of custodial interrogation.

The January 24 and April 2 interviews are closer calls. Mendiola reasonably felt apprehensive about them. In the first instance, federal agents summoned Mendiola to meet without his knowing the reason. (Tr. 89.) In the last, Mendiola had just learned about a problematic drug test result at work when McDoulett called him into the FBI office to listen to some recordings. (Tr.

51.) In both these interviews, unlike the other three meetings, he knew he was in trouble. Thus, with respect to the January 24 and April 2 interviews, the first two *Kim* factors lean toward custody. The remaining factors, however, do not. The physical surroundings of the FBI conference room, as described earlier, were not restrictive. The duration of each interview was about an hour. (Tr. 44, 84.) No pressure was applied to detain Mendiola: he came to each interview voluntarily, under his own power; he was not handcuffed or otherwise restrained; there was no show of force by the agents; access to the door was not blocked; he was allowed to make and take calls on his cell phone.

Most important, when he wanted to leave the interviews on January 24 and April 2, agents let him leave freely. Generally, when a suspect "is not placed under arrest, voluntarily comes to the police station, and is allowed to leave unhindered by police after a brief interview[,]" the circumstances do not amount to custody. *California v. Beheler,* 463 U.S. 1121, 1121 (1983). In *Oregon v. Mathiason,* 429 U.S. 492 (1977), a suspect was summoned to a police station to answer questions about a recent burglary. He was interrogated in an office, with the door closed. *Id.* at 493. To encourage a confession, the investigating officer lied to the suspect that his fingerprints had been found at the scene. *Id.* The Supreme Court found that the suspect was not in custody. The Court explained its reasoning thus: "[T]here was no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a half-hour interview respondent did in fact leave the police station without hindrance. It is clear from these facts that Mathiason was not in custody 'or otherwise deprived of his freedom of action in any significant way.'" *Id.* at 495 (quoting *Miranda*, 384 U.S. at 444).

A prominent factor in *Mathiason* and *Beheler* is that the police told those defendants, at

1    the outset of the interviews, that they were not under arrest. McDoulett testified that at the very

2    beginning of the January 24 interview, he told Mendiola he was not under arrest. (Tr. 22, 56.) Stole

3    testified that he heard McDoulett do so, and Mendiola conceded that he was told so. (Tr. 93, 154–

4    55.) But they also testified that Gordon told Mendiola he *could* be arrested. (Tr. 93, 104, 136, 139.)

5    This testimony is credible. By placing incriminating DVDs and phone numbers before Mendiola

6    on the conference table and writing on the whiteboard the criminal statutes he may have violated,

7    the agents clearly wanted to send the message that they had the goods on him. Notably, no one

8    told Mendiola that he would *not* be arrested even if he refused to cooperate. Mendiola reasonably

9    worried that if he did not cooperate, he would not walk out the door a free man.

10       Failure to advise a suspect that he is not under arrest may contribute to circumstances in

11   which a reasonable person under police questioning might not feel free to leave. *See Yarborough

12   v. Alvarado,* 541 U.S. 652, 665 (2004) (failure to tell suspect he was free to leave pointed toward

13   custody). This factor is far from dispositive: in *Kim*, for example, it made only a minor contribution

14   to an oppressive atmosphere that amounted to custody. *Kim*, 292 F.2d at 977–78 (police locked

15   defendant in her own store, isolated her from her son and husband, and questioned her for three

16   hours).

17       Here, however, Mendiola *was* told he was not in custody. The threat that he might find

18   himself in custody later doesn't mean that in the here-and-now Mendiola's freedom was

19   constrained to a degree associated with custody. On both January 24 and April 2, Mendiola walked

20   into the FBI office unrestrained, and he walked out the same way.

21       Because Mendiola was never in custody during any of the interviews, the statements he

22   made were not the product of custodial interrogation. The agents were under no obligation to

23   Mirandize him before questioning him, and their failure to do so is not grounds to suppress his

24

1    statements.

2            2.  *Voluntariness*

3        A conviction founded on an involuntary confession deprives a defendant of due process of

4    law. *Jackson v. Denno,* 378 U.S. 368, 375 (1964); *United States v. Tingle,* 658 F.2d 1332, 1334

5    (9th Cir. 1981). When the Government seeks to introduce a defendant's statements, it bears the

6    burden of proving by a preponderance of the evidence that the statements were voluntary. *Lego v.*

7    *Twomey,* 404 U.S. 477, 489 (1972); *United States v. Haswood,* 350 F.3d 1024, 1027 (9th Cir.

8    2003). Even noncustodial interrogations may, in special circumstances, produce involuntary

9    confessions. *United States v. Swint,* 15 F.3d 286, 289 (3rd Cir. 1994). The trial court must

10   determine "whether, considering the totality of the circumstances, the government obtained the

11   statement by physical or psychological coercion or by improper inducement so that the suspect's

12   will was overborne." *United States v. Leon Guerrero,* 847 F.2d 1363, 1366 (9th Cir. 1988). The

13   court must inquire into "both the characteristics of the accused and the details of the interrogation."

14   *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973). "Courts must 'weigh, rather than simply

15   list,' the relevant circumstances, and weigh them not in the abstract but 'against the power of

16   resistance of the person confessing.'" *United States v. Preston,* 751 F.3d 1008, 1017 (9th Cir.

17   2014) (quoting *Doody v. Ryan,* 649 F.3d 986 (9th Cir. 2011)).

18       A "significant factor" bearing on voluntariness is whether the defendant was "advised of

19   his right to remain silent or of his right respecting counsel at the outset of interrogation." *Davis v.*

20   *North Carolina,* 384 U.S. 737, 740–41 (1966). Other factors include "police coercion, the length

21   of the interrogation, its location, its continuity, the defendant's maturity, education, physical

22   condition, and mental health." *Withrow v. Williams,* 507 U.S. 680, 693 (1993) (internal citations

23   omitted). A confession cannot be considered involuntary absent "police conduct causally related

24

to the confession[.]" *Colorado v. Connelly,* 479 U.S. 157, 164 (1986). And yet the mere fact that officers used trickery will not, by itself, make a confession involuntary. *See Frasier v. Cupp,* 394 U.S. 731, 739 (1969) (confession voluntary under totality of circumstances even though police falsely told defendant that co-defendant had confessed).

Here, the question is whether the agents' promises to make Mendiola's cooperation known to prosecutors so overbore Mendiola's free will as to render his statements involuntary. A statement made in response to direct or implied promises is involuntary only if the promises were "sufficiently compelling to overbear the suspect's will in light of all attendant circumstances." *Leon Guerrero,* 847 F.2d at 1366. An interrogator's promise to recommend leniency to the prosecutor does not automatically render subsequent statements involuntary. *Id.* In *Leon Guerrero,* defendant made statements to the Assistant United States Attorney while cooperating in a federal investigation of government corruption. *Id.* In finding that the statements were voluntary, the court considered that the defendant had not been promised "any tangible benefit[,]" not even "a recommendation of a lenient sentence"; that the prosecutor emphasized it was defendant's choice whether to cooperate; that defendant was a college-educated businessman; that he came to the FBI office voluntarily; that he was "fully advised of his constitutional rights" at each meeting, and was given the opportunity to consult with an attorney when he so requested; and that the interrogations were fairly brief. *Id.* at 1367.

Mendiola's statements to federal agents in interviews prior to April 2 were voluntary. He came to and went from the interviews of his own volition. He was never physically restrained. His access to the outside world was not encumbered, as shown by the fact that agents allowed him to receive calls on his cell phone at the first meeting. Agents did not make specific, concrete promises of lenient treatment by the prosecutors or the courts, let alone promise he would "get off clean."

They did not trick Mendiola into making incriminating statements. They did not question him about the February and March 2013 alleged drug buys for which he now stands charged. Their interest was not in gathering further evidence against Mendiola, in the form of a confession, but in inducing Mendiola to help them, as McDoulett put it, catch drug traffickers "further up the chain." (Tr. 19.) They confronted him with the evidence they already had against him (Tr. 67), but did not ask him to add self-incriminating statements.

The circumstances surrounding the April 2 interview, however, differ in two significant respects from those of previous meetings. Special Agent McDoulett pressured Mendiola to make incriminating statements, and tricked Mendiola into identifying his own voice and car in audio and video recordings of alleged drug buys from late February and early March of 2013. McDoulett called Mendiola into the FBI office for two purposes: to play him the recordings and to cut him loose as an FBI informant. (Tr. 80.) On cross-examination, McDoulett readily admitted that he played the recordings first, before telling Mendiola the cooperation agreement was terminated, in order to improve the chances that Mendiola would incriminate himself (Tr. 83):

> Q: Now then, after you got all that information from Mr. Mendiola, that's when you told him that he could no longer be an informant; correct?
> A: That's correct.
> Q: And you had known before he ever came in for that meeting that you were going to – [I don't know,] is terminate the word, close I think, close him as an informant?
> A: Yes.
> Q: You didn't tell him that until he had already given you a great deal of information identifying and clarifying the evidence against him; correct?
> A: That is correct.
> Q: Because if you had closed him right at the beginning of the meeting, there's a good chance that he would not have [then gone] on to [give you] all of this clarifying information; correct?
> A: That's correct.
> Q: OK. So he gave you that information in the belief that he was still an informant; correct?
> A: Yes.

From the outset, agents had impressed on Mendiola the importance of complete truthfulness if he wished to benefit from cooperation. At the first meeting, when Officer Stole sensed that Mendiola was hesitant to provide a supplier's telephone number, he took Mendiola aside and urged him in Chamorro to tell the truth. (Tr. 30, 96.) At the February meeting, Mendiola was specifically admonished in writing that he "must provide truthful information to the FBI." (Ex. 2, p. 2 ¶ 2.) McDoulett took advantage of these circumstances when he pressed Mendiola to identify Mendiola's own voice in the recording: "I told him that he knew very well who that other voice was and that he was lying to me about having difficulty listening to it. We played the entire recording for his benefit and eventually, he did identify his own voice on the telephone recording." (Tr. 52.)

What distinguishes this case from *Leon Guerrero* is that Mendiola did not know the true purpose of the interview. In *Leon Guerrero,* FBI agents forthrightly told the defendant that they were investigating his own alleged criminal conduct. 847 F.2d at 1364. McDoulett did not so inform Mendiola on April 2, but let him persist in the illusory belief that the cooperation agreement was still salvageable. If McDoulett had started the interview by informing Mendiola he was terminated as an informant, he could then have encouraged Mendiola to confess by offering still to put in a good word for him with the United States Attorney. That would have created circumstances analogous to *Leon Guerrero.* But that's not what happened.

Instead, the circumstances more closely resemble those of *United States v. Jacobs,* 431 F.3d 99 (3rd Cir. 2005). Josette Jacobs had been a confidential informant for 10 years when her FBI "handler" began to suspect she was involved in unauthorized drug dealing and "'closed' her as an informant without informing her." *Id.* at 102–3. He then summoned her to the FBI office and, in the squad bay area, confronted her about her role in certain drug transactions under

investigation. *Id.* at 103–4. In response to questioning, and without ever having been Mirandized or told her time as a confidential informant was over, Jacobs made incriminating statements. *Id.* at 104.

The Third Circuit affirmed the district court's finding that Jacobs' statements were involuntary. *Id.* at 110, 114. It pointed to several factors: that the FBI agent, not Jacobs, had insisted on meeting but without telling her the reason; that when Jacobs agreed to meet she didn't know she would be interrogated; and that at a previous meeting, her handler had encouraged her to own up to her role in unauthorized drug transactions "because if it comes out later, I can't cover you." *Id.* at 113. It considered these and other factors within the context of Jacobs' 10-year relationship with the handler, during which time the agent had sometimes assisted Jacobs when she was facing charges for unauthorized criminal activities by putting in a good word for her with prosecutors. *Id.* at 102, 113. In the light of this history, "Jacobs could have reasonably inferred that . . . he [the FBI agent] would not then turn around and affirmatively get her into trouble by using her statements to him against her." *Id.* at 113.

Like Jacobs, Mendiola was summoned to the April interview by his "handler" (McDoulett), was not advised of his rights, and was not told he had already been terminated as an informant. But the differences between Mendiola's circumstances and Jacobs's are equally apparent. First, McDoulett had given Mendiola an inkling of what the interview would be about. When he called Mendiola to come over to the FBI office, he told him the purpose was "to listen to some recordings." (Tr. 51.) At the very first meeting in January 2014, McDoulett had placed DVD recordings on the table before Mendiola and confronted him with the evidence the FBI already had against him regarding the February and March 2013 drug transactions. (Tr. 67, 135.) Second, as a longtime law enforcement officer himself, Mendiola was familiar with his constitutional rights.

During training, Mendiola had been given an advisement card from which to read arrestees their rights; and because of this training, he had known to ask, at the January meeting, whether he needed a lawyer. (Tr. 154.) Third, his relationship with McDoulett had been brief (less than three months) and unproductive, and the agent had not interceded with prosecutors on Mendiola's behalf.  Fourth, McDoulett had not told Mendiola he would "cover" for him or said anything else that would reasonably have led Mendiola to believe incriminating statements would be off the record.

Under the totality of the circumstances, it cannot be said that Mendiola's will was overborne. As a law enforcement officer for twelve years, Mendiola knew what his constitutional rights were and knew how to assert them. His brief and unproductive stint as a confidential informant did not establish a course of conduct with McDoulett that would lead him reasonably to believe his statements would not be used against him. He knew that the FBI had built a case against him for the February and March 2013 alleged drug buys. Mendiola could not have been taken completely by surprise when McDoulett played the tapes from those dates and he identified the other person, for McDoulett had asked him to come in to listen to recordings.

The only compelling evidence that Mendiola's statements were involuntary is McDoulett's deception. Yet deceptive police techniques alone are rarely enough to violate due process. For example, in *Ortiz v. Uribe,* 671 F.3d 863 (9th Cir. 2011), the defendant made incriminating statements to a polygraph examiner who concealed her identity as a police detective, used an empathic, maternal tone to encourage him to be truthful, and appealed to his moral obligation to his family. The court held that this type of "emotionalism and confusion" did not amount to impermissible psychological pressure. *Id.* at 872 (quoting *United States v. Miller,* 984 F.2d 1028, 1032 (9th Cir. 1993)). Likewise, the fact that the police falsely tell a suspect that a confederate has already confessed is not enough, by itself, to make a statement involuntary. *See Frazier,* 394 U.S.

at 739.

It is troubling that Special Agent McDoulett delayed telling Mendiola the cooperation agreement had ended so as not to raise his guard against incriminating himself. But that police tactic must be balanced against the characteristics of this defendant: a 12-year veteran of local law enforcement who knows his rights and is familiar with police techniques. Considering all the circumstances, the statements Mendiola made in the April interview were, like those he made in earlier interviews, a product of his free will and therefore voluntary. Because Mendiola was never in custody and his statements were voluntary, there is no cause to suppress the statements.

**IV.   CONCLUSION**

For the foregoing reasons, Defendant's Motion to Dismiss Indictment or Suppress Evidence is DENIED. The matter is set for trial on October 7, 2014, at 10:00 a.m. The pretrial order of June 20, 2014 (ECF No. 24) remains in effect.

SO ORDERED this 19th day of August, 2014.

_____
RAMONA V. MANGLONA
Chief Judge